Filed 7/27/26  P. v. Pena CA2/1

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE, | B349486 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. 25CMCF00443) |
| v. | |
| RUDY ALBERTO PENA, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Hector E. Gutierrez and Patrick Connolly, Judges.  Affirmed.

Sarah S. Sanger, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Charles C. Ragland, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Steven D. Matthews and Michael J. Wise, Deputy Attorneys General, for Plaintiff and Respondent.

———————————————

Rudy Alberto Pena pleaded no contest to one count of stalking with a temporary restraining order in effect and one count of attempting to dissuade a witness. The trial court sentenced him to four years in prison. Pena obtained a certificate of probable cause and appealed from the judgment. He contends the trial court abused its discretion by denying his pre-plea motion for mental health diversion, pursuant to Penal Code[1] section 1001.36. We affirm.

## BACKGROUND

### A.     The Charges

A first amended information charged 37-year-old Pena with four felony counts of violation of a domestic violence court order with a prior conviction and act of violence (§ 166, subd. (c)(1); counts 1, 6, 9 & 12), misdemeanor battery on a spouse (§ 243, subd. (e)(1); count 2), felony stalking with a temporary restraining order in effect (§ 646.9, subd. (a); count 3), misdemeanor vandalism under $400 by damage or destruction of property (§ 594, subd. (a); count 4), three misdemeanor counts of contempt of court (§ 166, subd. (c)(1); counts 5, 8 & 11), and three felony counts of attempting to dissuade a witness (§ 136.1, subd. (a)(2); counts 7, 10 & 13). The first amended information also alleged five factors in aggravation under California Rules of Court, rule 4.421, including that in committing all of the charged offenses, Pena engaged in violent conduct that indicates a serious danger to society. (Cal. Rules of Court, rule 4.421(b)(1).)

---

[1] Undesignated statutory references are to the Penal Code.

## B.    Factual Background

We take our account of the circumstances of the charged offenses from the transcript of the April 1, 2025 preliminary hearing, as the parties did in their appellate briefing. The victim of the offenses, Pena's wife Myra J., testified to the following.

Pena and Myra had been married for approximately 13 years and have three children, who were then 12 years of age and younger. Between May 2015 and December 2021, five court orders were issued protecting Myra from Pena. One of these orders, issued in 2017, is a 10-year protective order that expires in 2027.

On or about November 11, 2024, Pena was released from custody after being "incarcerated for a while." Two days later, on November 13, 2024, he was in Myra's home, when he became "aggressive," slapped her face, and told her it was "a wake up call." The children were present but in another room. Fearing for her safety and wanting to protect her children, Myra left home with the children and went to stay with her mother. After November 13, 2024, Pena did not have permission to be in Myra's home.

On or about November 16, 2024, Myra's landlord called her and told her he was at her home to fix a broken window, and there was someone inside. Myra contacted the police. When she arrived at her home, she observed officers removing Pena from the residence.

On November 25, 2024, Myra's landlord phoned her again and told her that someone was breaking a window at her home. When Myra arrived, Pena was outside her home in a police car, handcuffed.

3

One of the police officers who responded to Myra's home on November 25, 2024, testified at the preliminary hearing. He stated that he located Pena behind the residence and took him into custody. The officer watched a surveillance video and observed Pena swing the metal portion of a water hose at a window at the rear of Myra's residence, breaking the window.

Myra further testified that on December 14, 2024, she was with Pena and their children in her home. She lit some incense, and Pena opened a door to the outside. One of the children closed the door because she was cold. Pena entered the room where Myra and the children were, and he slapped Myra's face in front of the children. He opened the door and stated that he wanted it to remain open.

Myra testified that the above-described events occurred when Pena was under the influence. She indicated that he used methamphetamine. She stated that "when he is under the influence," he "has something against her personally," and she feared for her safety.

Between January and March 2025, Pena called Myra from jail numerous times. During Myra's testimony, the prosecutor played audio recordings of seven calls. In some of them, Pena told Myra not to testify. During one call, he told her that he would kill her if she cheated on him. This "worried" her and she thought about the possibility of him following through on the threat. On another call, he said he "was going to fuck her up when he got out of jail," and she understood that to mean that he "was going to hurt" her.

In holding Pena to answer for the charges, the court commented that the evidence showed Myra was "terrified" of Pena.

**C.     Motion for Mental Health Diversion**

**1.     *Moving papers***

In September 2025, Pena filed a motion for mental health diversion pursuant to section 1001.36.  In the factual background section of the motion, Pena indicated that between January and March 2025, he called Myra from jail 86 times.

Pena stated he was statutorily eligible and suitable for diversion, based primarily on the information contained in an attached report describing his August 2025 psychological evaluation by a clinical psychologist.  The psychologist reported that Pena "was argumentative and defensive throughout the evaluation.  He was evasive when discussing details of the current charges and tended to minimize his behavior and externalize responsibility for his criminal actions.  His mood was irritable and angry. . . .  He demonstrated poor insight into his legal situation and the impact of his substance abuse on his interpersonal relationships and overall level of functioning."

The psychologist summarized Pena's criminal history, and described one incident in detail, as follows:  "In 2021, the defendant ripped open the bedroom window screen of the victim's home and entered.  He ran into the living room where the victim and their three children were located.  He grabbed all three children and ran out the front door.  The victim ran after him, but the defendant pointed a stick at her and threatened to hit her.  The defendant's mother was able to grab two of the children. He, then, ran into the street with the remaining child, weaving between cars traveling at high rates of speed.  The victim called the police, who were able to locate and detain the defendant shortly thereafter.  He appeared to be under the influence of methamphetamine (sweating, rapid unintelligible speech,

5

restlessness), which he spontaneously admitted to. When queried about this offense, the defendant stated: 'I walked the kid barefoot.' "

The psychologist stated Pena had the following diagnoses identified in the DSM-V: severe amphetamine use disorder and severe alcohol use disorder. (See § 1001.36, subd. (b)(1) [eligibility for mental health diversion requires that the defendant "has been diagnosed with a mental disorder as identified in the most recent edition of the Diagnostic and Statistical Manual of Mental Disorders [DSM]"].) The psychologist reported that Pena began abusing alcohol at age 13, and he began abusing methamphetamine at age 14. In 2021, he participated in drug rehabilitation treatment twice, for three months each time. "He relapsed within one month of leaving one program and within one day of leaving the other program." When the psychologist asked why he relapsed, he stated, " 'I needed more tools.' "

The psychologist concluded that Pena's "drug use has contributed to legal problems, family estrangement, unemployment, and housing instability, and he is likely self-medicating underlying psychiatric problems." The psychologist further concluded: "The combination of the defendant's executive dysfunction [resulting from adolescent drug and alcohol use], polysubstance abuse, and inconsistent communication by the victim have likely been contributing factors to Mr. Pena's inability [to] behave in a rational manner, manifesting as aggression, poor judgment, and challenges with impulse control. He was under the influence of methamphetamine at the time of the incidents and was cognitively aberrant, which led to his behaviors in the instant offenses." (See § 1001.36, subd. (b)(2)

6

[eligibility for mental health diversion requires that the "defendant's mental disorder was a significant factor in the commission of the charged offense"].)

Turning to Pena's suitability for pretrial mental health diversion, the psychologist addressed whether Pena's mental health needs would "respond to mental health treatment" (see § 1001.36, subd. (c)(1)) as follows: "Mr. Pena has a significant criminal history and his actions in the instant offense occurred because of his significant abuse of methamphetamine. The defendant would benefit from at least nine months of consistent supervised treatment given concerns for relapse potential, lengthy history of housing and financial instability, interpersonal difficulties, and behavioral escalation if the treatment is limited. He does have some insight into his need for drug rehabilitation treatment, albeit limited. Based on my clinical interview and the information provided to me, it is recommended that he receive ongoing psychological treatment in a dual diagnosis residential treatment program under supervision with psychiatric medication, if appropriate, for at least 90 days followed by treatment at a sober living [facility] for an additional 180 days. The defendant would also benefit from domestic violence classes." The psychologist concluded, "There is a likelihood, if placed in a supportive environment with supervision and appropriate mental health diagnosis and treatment, Mr. Pena may have success in gaining sobriety, learn to regulate his emotions, and develop appropriate life skills."

Pena attached to the motion a letter from a provider, confirming his eligibility for admission into a "3-month dual diagnosis residential substance abuse treatment program, which can be extended for an additional 3-6 months" at a specified sober

7

living facility. The program includes participation "in group counseling sessions that provide alcohol and drug education, relapse prevention, coping skills, 12-step work, self-esteem building, individual counseling sessions, 12-step meetings, and random alcohol and drug testing."

The final statutory suitability criterion addressed in the psychologist's report was whether Pena would "pose an unreasonable risk of danger to public safety, as defined in Section 1170.18, if treated in the community." (§ 1001.36, subd. (c)(4).) Under section 1170.18, subdivision (c), " 'unreasonable risk of danger to public safety' means an unreasonable risk that the petitioner will commit a new violent felony within the meaning of clause (iv) of subparagraph (C) of paragraph (2) of subdivision (e) of Section 667," i.e., a "super strike" offense, including murder and attempted murder. The psychologist's analysis of this criterion states in full: "It is unlikely that [Pena] will commit the excluded offenses under mental health diversion. His prior criminal history is primarily related to his drug use. The instant offenses appear to be the result of his untreated mental health and drug use."

Pena addressed the remaining suitability criteria in his motion, stating that he consented to diversion and would waive his right to a speedy trial (§ 1001.36, subd. (c)(2)), and that he agreed to comply with treatment as a condition of diversion (§ 1001.36, subd. (c)(3)).

### 2. *Opposition*

The prosecution filed an opposition to the motion, which described a history of domestic violence between Pena and Myra. The prosecution referenced a January 2015 incident, which resulted in a conviction of battery against a spouse (§ 243, subd.

8

(e)(1)) and the issuance of the first protective order. According to the prosecution, on that occasion, Pena grabbed Myra by her hair, "forced her to the floor," and "punched her in the back multiple times" while she was "lying face-down." The prosecution also referenced a September 2017 incident, which resulted in a conviction for violation of a protective order (§ 166, subd. (c)(1)) and the issuance of the 10-year protective order. According to the prosecution, police officers responded to Myra's home "after receiving a call that [Pena] was hitting her."

The prosecution argued Pena was unsuitable for mental health diversion for two main reasons. First, the prosecution asserted it did not appear Pena would be able to comply with any treatment plan based on (1) his unsuccessful attempts at drug rehabilitation treatment in 2021 and (2) his "lack of ability to take accountability for his actions." The prosecution argued that Pena had "consistently violated criminal protective orders since at least 2015 and shown he cannot follow the most basic court-mandated restrictions."

Second, the prosecution asserted Pena would pose an unreasonable risk of danger to public safety if treated in the community. The prosecution argued: "Defendant's conduct in this case, coupled with his criminal history, shows an escalation in increasingly dangerous conduct. Defendant has repeatedly violated domestic violence protective orders, engaged in violent conduct, and verbally threatened [the] [v]ictim. Even after the present case was filed, Defendant still continued to make statements in jail indicating he will be violent in the future. This pattern of violence and defiance shows he is a risk not only to the victim in this case, but his children, and the public at large."

9

The prosecution further argued that the "proposed mental health treatment program is insufficient to provide for continued public safety" for the following reasons: "Defendant has been previously given the opportunity to engage in treatment programs. He voluntarily left those programs and continued to engage in violent conduct. Given that Defendant's actions show a consistent and rising level of violence and frequency, it is clear that the proposed program would not account for Defendant committing future violence."

### 3. *The court's ruling*

On September 22, 2025, the trial court held a hearing on the motion. Neither party presented argument. The trial court found Pena eligible for diversion, but not suitable.

The court listed the eligibility and suitability criteria it needed to consider, noting among them that the court had "to be satisfied that the defendant will not pose an unreasonable risk of danger to public safety as defined in section 1170.1[8] if treated in the community."

The court commented that Pena had an "extensive criminal history," and provided a summary of that history for the record, but "going back only until 2015." As reflected in the court's summary and the probation report, between 2015 and 2024, Pena was convicted of six misdemeanors and six felonies. Of his four most recent convictions, three were felonies: an August 2019 conviction for burglary (§ 459), for which he was sentenced to five years in prison; a November 2021 conviction for violation of a protective order, within seven years of a prior conviction for the same offense, and involving an act of violence or a credible threat of violence (§ 166, subd. (c)(4)), for which he was placed on probation and subsequently sentenced to three years in prison

after a probation violation; and a September 2022 conviction for carrying a concealed dirk or dagger (§ 21310), for which he was placed on probation and subsequently sentenced to three years in prison after a probation violation.

After quoting portions of the psychologist's report, the court ruled as follows:

"I don't find that Mr. Pena is a suitable candidate for mental health diversion for many reasons. He has an extensive criminal history that has resulted in multiple state prison commitments. The expert's own report stated that he was uncooperative and minimized his conduct.

"Additionally, [defense counsel] has appended [to the motion] as Exhibit B a proposed treatment program. The People have raised concerns about the suitability of that program. The court shares those."

After quoting the psychologist's treatment recommendation, the court continued:

"The People brought to the court's attention and the court also noted that Mr. Pena previously was unsuccessful in receiving treatment.

"The biggest issues that the court has are whether or not Mr. Pena's symptoms of mental disorder motivating the criminal behavior would respond to mental health treatment.

"I'm aware of the language in the appellate opinions in regards to an unreasonable risk of danger to public safety.

"On repeated occasions, according to the People, based on what they have filed, Mr. Pena has contacted the victim in direct violation of a stay-away order, assaulted her not on every single occasion [*sic*]. And the People have brought to the court's

11

attention that pending a trial he has contacted her by way of telephone and urged her not to cooperate with court process.

"I don't find him to be suitable within the spirit and the meaning of [section] 1001.36. I think the record is quite clear his extensive criminal history and the expert's own statements in regards to Mr. Pena during the evaluation process, minimizing his behavior -- I don't have confidence that he would follow through with mental health diversion. So I'm respectfully denying your motion, [defense counsel]."

### D. No Contest Plea

On October 6, 2025, Pena pleaded no contest to one count of stalking with a temporary restraining order in effect (count 3) and one count of attempting to dissuade a witness (count 7). He admitted the factor in aggravation set forth in California Rules of Court, rule 4.421(a)(7) (the "defendant was convicted of other crimes for which consecutive sentences could have been imposed but for which concurrent sentences are being imposed").

Under the terms of the plea negotiation, the trial court sentenced Pena to the upper term of four years on count 3, imposed a concurrent upper term of three years on count 7, and dismissed the other counts. The court issued a new protective order requiring Pena to refrain from contacting Myra, among other things.

Pena filed a timely notice of appeal from the judgment, stating he was challenging the denial of the motion for mental health diversion. The trial court granted his request for a certificate of probable cause.

12

## DISCUSSION

Pena contends the trial court abused its discretion in denying his motion for mental health diversion based on findings that he would pose an unreasonable risk of danger to public safety if treated in the community (§ 1001.36, subd. (c)(4)), and that he did not show his symptoms would respond to mental health treatment (§ 1001.36, subd. (c)(1)).

### A.    Legal Principles Regarding Diversion and Standard of Review

Diversion under section 1001.36 "allows for the suspension of criminal proceedings and potential dismissal of charges upon successful completion of mental health treatment." (*Sarmiento v. Superior Court of San Diego County* (2024) 98 Cal.App.5th 882, 890 (*Sarmiento*).)  One of the purposes of the legislation is "[i]ncreased diversion of individuals with mental disorders to mitigate the individuals' entry and reentry into the criminal justice system while protecting public safety." (§ 1001.35, subd. (a).)

"[M]ental health diversion requires trial court findings that the defendant is both *eligible* for diversion and *suitable* for the program.  The criteria for each are specified in the statute. (§ 1001.36, subds. (b) & (c).)  Defendants are eligible if they have been diagnosed with a recognized mental disorder that was a significant factor in the commission of the criminal offense with which they are charged.  (*Id.*, subd. (b).)  They are suitable if: (1) in the opinion of a qualified mental health expert, the defendant's mental disorder would respond to treatment; (2) the defendant agrees to waive their speedy trial rights; (3) the defendant agrees to comply with treatment requirements; and (4) the defendant will not pose an 'unreasonable risk of danger to

13

public safety' as defined in sections 1170.18 and 667, subdivision (e)(2)(C)(iv). (§ 1001.36, subd. (c).)" (*Sarmiento, supra,* 98 Cal.App.5th at p. 891.)

If "the defendant satisfies the eligibility requirements," and "the court determines that the defendant is suitable for [pretrial] diversion," the trial "court may, in its discretion, and after considering the positions of the defense and prosecution, grant pretrial diversion to [the] defendant." (§ 1001.36, subd. (a).) The court must exercise its discretion "consistent with express statutory requirements and the underlying purposes of mental health diversion . . . ." (*Sarmiento, supra,* 98 Cal.App.5th at pp. 895-896.) "A court abuses its discretion when it makes an arbitrary or capricious decision by applying the wrong legal standard [citations], or bases its decision on express or implied factual findings that are not supported by substantial evidence." (*People v. Moine* (2021) 62 Cal.App.5th 440, 449 (*Moine*).)

## B. Substantial Evidence Supports the Finding that Pena Posed an Unreasonable Risk of Danger to Public Safety If Granted Diversion

Unreasonable risk of danger to public safety means "a likelihood that if the defendant is granted diversion, [he or] she will commit one of the 'super strike' violent felonies enumerated in section 667, subdivision (e)(2)(C)(iv)." (*Sarmiento, supra,* 98 Cal.App.5th at p. 895; *Moine, supra,* 62 Cal.App.5th at pp. 449-450.)[2] "Those super strikes are murder, attempted murder,

---

[2] The trial court did not expressly state on the record that it found a likelihood that Pena would commit a super strike offense if granted diversion. However, the court did expressly state that in order to grant diversion, it had "to be satisfied" that Pena would not pose an unreasonable risk of danger to public safety

14

solicitation to commit murder, assault with a machine gun on a police officer, possession of a weapon of mass destruction, any serious or violent felony punishable by death or life imprisonment, or any sexually violent offenses or sexual offense committed against minors under the age of 14." (*People v. Whitmill* (2022) 86 Cal.App.5th 1138, 1150-1151 (*Whitmill*).)[3]

In deciding whether a defendant poses an unreasonable risk of danger to public safety, the "court may consider the opinions of the district attorney, the defense, or a qualified mental health expert, and may consider the defendant's treatment plan, the defendant's violence and criminal history, the current charged offense, and any other factors that the court deems appropriate." (§ 1001.36, subd. (c)(4).) We review a trial court's finding that a defendant poses an unreasonable risk of danger to public safety for substantial evidence. (*Sarmiento*, *supra*, 98 Cal.App.5th at p. 897; *Whitmill*, *supra*, 86 Cal.App.5th at p. 1150.)

Pena had a history of perpetuating physical violence against Myra. Five protective orders did not deter him from continuing to batter her and break into her home. In a three-month period after his arrest for the current offenses, he called her 86 times from jail. During these calls, he threatened to "fuck her up" when he got out of jail and kill her if she "cheated" on

---

"as defined in" section 1170.18, so the requisite finding was implied.

[3] "A defendant may not be placed into a diversion program" if his or her current charged offense is one of a number of super strike offenses specifically enumerated in the diversion statute. (§ 1001.36, subd. (d).) Pena's charged offenses did not so disqualify him from the diversion program.

him. The psychologist described him as irritable and angry, he "minimize[d] his behavior," and had "poor insight." These facts constitute substantial evidence supporting a finding that there was a likelihood Pena would commit a super strike offense (e.g., attempt to kill Myra) if granted diversion. Denial of the motion on this basis was not an abuse of the court's discretion. Therefore, we need not review the court's finding as to the suitability of the proposed treatment plan.

## DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED

M. KIM, J.

We concur:

ROTHSCHILD, P. J.

BENDIX, J.

16